Case number 20-1236. Tenley Good v. BioLife Plasma Services LP et al. Arguments not to exceed 15 minutes per side. Mr. Tyler, you may proceed for the appellant. Thank you. Good afternoon, your honors. My name is Bob Tyler. I represent Tenley Good. I have reserved three minutes for rebuttal. Fine. Thank you. Basically, what happened in this case, as the court knows from reviewing the briefs, is that the trial court made decisions on summary judgment that really should have awaited the trial of this matter. Interestingly enough, in the opinion on page nine, the court indicated that it must view and draw all reasonable inferences in favor of the non-moving. Unfortunately, the trial court did not do that. They decided issues of credibility, even though none of the witnesses had testified by video deposition, so the court did not have an opportunity to see any of the witnesses to judge their mannerisms, those many things that we do when we're judging the credibility of a witness. The trial court reconciled all facts adverse to Tenley Good in favor of the defendant, even though to do that, the trial court had to ignore substantial evidence that was favorable to Tenley Good's position. The court came to the trouble primarily by what it felt was a lack of evidence of the probability of there being an adverse reaction at the time of the capillary sample, and whether or not that should have been anticipated by the bio-life, and whether or not they actually had asked the question about adverse reactions. As this court knows, the only bio-life person that contends any question was asked about adverse reactions with respect to Tenley Good was Obanimus Reeves. He had no memory of Tenley Good, which is not surprising, frankly, but she had no documentation on the vein check that indicated she had inquired as to an adverse reaction. Tenley Good executed an affidavit, which the trial court essentially dismissed as a sham affidavit, even though the main question that was answered in that affidavit was never asked in her deposition. So that affidavit did not contradict anything that she had said or testified to in her deposition. That crucial question was, if someone at bio-life had asked you if you'd ever had an adverse reaction with respect to blood donation, blood, etc., what would you have said? And Tenley Good said in her affidavit that she would have told them had they asked. And as this court knows, it is admittedly well-documented in Tenley Good's family that she has this kind of reaction whenever she is exposed to blood, whether it's her own or the tendency to be lightheaded and pass out, which in exercising just the common knowledge that all of us has, is not that unusual. I'm sure all of us know people who have had that kind of reaction, maybe some of us have had it ourselves. There was no direct evidence from anyone at bio-life, either documented or through testimony, that Tenley Good was ever asked if she had had an at bio-life with respect to when that would happen. Was for sure it would happen in a questionnaire, which was the last thing that would happen just prior to donation of the plasma. That routine set up by bio-life would occur after the finger poke in the capillary sample. Nurse Parks, who was on the floor, worked on the floor, said that the medical historian at Tenley would have seen at least once, most likely twice, before the finger poke and at the finger poke, was required to ask her if she had had an adverse reaction. Now the trial court dismissed Nurse Parks saying that the center's director was at a higher level to know what should go on or shouldn't go on and totally dismissed Nurse Parks testimony. The reality is that the status of somebody within any kind of operation does not that they know more about some aspect of that operation. Simple example is my title is higher than that of my legal assistant, but I can assure you there are a lot of things in my practice that she knows about that I do not know about or she knows better than I do. And that's the same situation here. You have a center director, and frankly, I wish I had taken her video deposition because of the credibility issue, who basically takes a petition and defends bio life that they can never have done anything wrong ever. That's put up against somebody who works on the ground at the level of the donors, said medical historian prior to the finger poke should have taken a adverse reaction. The issue of the probability of this happening was discussed in almost every deposition of a bio life person that was taken. Nurse Reeves discussed it. Supervisor Stahl discussed it, talked about her training, how she knew about it. And even the center director acknowledged she knew of episodes at bio life. Interestingly enough, while the trial court dismisses the probability this happened, of course, the defense's position was based, the probability of this happening is too low. Nurse, or excuse me, medical historian Roberts was trained what to do in the event adverse reaction occurred. So if, in fact, the trial court was correct that the probability of this happening was so low that it was not a breach of 302 to take it into consideration, one has to wonder why then would the medical historian Roberts have been trained how to handle it when it did happen, which is exactly what happened. Even the defendant's one expert, Figueroa, came up with studies that showed, although using minimal numbers, that this does happen. And when you translate that as we did in our brief to the bio life situation, potentially 100 people or more could have had an adverse reaction. Was that due to the finger prick or was that an adverse reaction due to the giving of blood plasma at the donation level? Candidly, your honor, there is a little bit of overflow with respect to when the adverse reaction happens, whether it's in when you see blood, finger poke, donating blood, donating plasma, but it is really the concept that someone reacts to on or not, that it is a known phenomenon. And that really, with all due respect to the trial court, is what we submit what trial court missed. The fact that whenever there is blood, regardless of the situation, finger poke or otherwise, there is a potential for an adverse reaction. The trial court dismissed both of my experts, even though they had 34 years combined in this area, where they, on a day-to-day regular basis, dealt with situations of people having blood drawn, sampled, being exposed to seeing blood. Did the district judge hold a Daubert hearing or what was the, what part of the Daubert phase was this? I'm sorry, your honor, didn't mean to interrupt you. That's okay. The trial court did not hold the Daubert hearing. There were challenges in writing, form of motions, etc., with respect to the qualifications of the where the experience would be gone into and exposed to cross-examination by the court. But all of the credentials of Mr. Stanley and Nancy Erickson was presented to the court. And as indicated in our briefs and as was indicated at the trial court, Nancy Erickson was actually one of the reviewers for one of the standards committee with respect to how laboratories should proceed. Mr. Stanley was a director for Shield Quest, which is a nationally known situation company that deals in laboratory and blood draws. Both of them had worked as involved in actually extracting blood in some form or another from a person. None of that was taken into consideration by the trial court. The judge, in fact, said neither Mr. Stanley or Nancy Erickson were qualified to make the assessment. And with all due respect to the trial court, that is just entirely wrong. It is a question of fact of an expert up against another expert. In fact, one of the defendants' experts, Mr. Summers, works for a company, CSL, whose setup for when there will be the screening process is exactly what both of the Tinley Goods experts said should happen. And there's a picture of that setup in our brief, where they are seated at a lower chair. They are in a confined space. And yet, Mr. Summers says, I've never heard of this phenomenon where somebody would react. Our position is that really is incredible. The situation here is that clinical historian Roberts indicated that what happened after the finger poke, the chair turned because it swivels. She was unable to hold Tinley, and she fell to the ground and was injured. Our position is that basically the trial court gave all the benefit of every doubt of every issue to the defense in a summary judgment ruling, which is obviously not what the court, the trial court is supposed to do. It is not what the trial court said on page nine of its opinion that it was required to do. Thank you. Thank you. Ms. Heiss. Yes, Your Honor. You may proceed. May it please the court. Good afternoon, Your Honors. My name is Jennifer Heiss, and I represent defendants at Biolife Plasma Services and Shire U.S. Inc. The district court properly granted summary judgment in this case because Biolife did not breach any duty it owed to the plaintiff, and plaintiff presented no admissible evidence to dispute that. Summary judgment should be affirmed on that basis. But plaintiff's claim also fails for three additional reasons. First, Biolife owed plaintiff no duty. Plaintiff primarily assumed the risk, and plaintiff cannot establish causation for her claim. All three are additional reasons this court can affirm that this is the court's decision in granting summary judgment. Can I ask you first about assumption of the risk? My understanding is while that might be a good defense in some states, my understanding that in Michigan it's been removed of viability in a context of this type. You have a contrary understanding, obviously. Can you explain to me where you derive that? Yes, Your Honor. In Hundley v. DuPont Automotive, this court, applying Michigan law, affirmed the district court's ruling and applied primary assumption of the risk. Now, it was a narrower holding. It was primary assumption of the risk, not as broad as the common law assumption of the risk that we all learned in law school. In that case, this court held that the doctrine is viable only when the plaintiff is an employee or an independent contractor, and the risks alleged to have caused the injury were the very risks inherent in the plaintiff's agreement to do the job. It is a narrow application, Your Honor, but it's really no different than the facts here. How do we transform this plaintiff into an employee or independent contractor? Yes, Your Honor. This plaintiff was a vendor who was attempting to qualify herself to sell her plasma. She would have received compensation from BioLife if she had successfully donated plasma, and so she was akin to an independent contractor. She was aware that she would have a capillary sample taken as evidenced by her consent. She read aloud at BioLife that she agreed to the withdrawal of her blood, and she understood what a capillary sample was. Wouldn't the application of assumption of risk to people who are employees or independent contractors be based on the opportunity that those individuals would have to know procedures and inherent in the premises? That doesn't seem very analogous to this case to me. Your Honor, this plaintiff did understand the risks inherent in the procedure. She had donated blood on several occasions previously. She had had a capillary sample previously, and in fact, she had lost consciousness during a previous capillary sample, so she was aware of the specific risks. Seems to me that in this case, that probably goes to comparative negligence. I mean, we could wonder why this plaintiff didn't volunteer her history from the get-go without regard to whether anybody asked her about it or not, but that's what you'd be arguing to the jury if the case goes to trial, I would think. Yes, you're right, Your Honor. That does go to comparative negligence, but I also think it informs the primary assumption of the risk, and there is no explanation in the record as to why a plaintiff didn't volunteer her history of adverse reactions here, but there is in the record the fact that she would have been, with her particular history of adverse reactions, she would have been permanently deferred as a donor and not able to receive any compensation from BioLife, so this is a circumstance where it does kind of go back to the assumption of the risk and the ability to understand the facts and receive compensation for agreeing to those risks. Did you put evidence in about BioLife having a policy that they would not accept her as a donor? Is there some piece of evidence that supports that? Yes, Your Honor. There is testimony from Katie Pietrzak, the center supervisor, in the record about what would have happened if she had answered during the vein check affirmatively that she had donated blood before and in that experience had lost consciousness. She would have been sent to a nurse for further evaluation, and the nurse, after eliciting more testimony about the circumstances under which she had lost consciousness and the frequency. Ms. Good had lost consciousness many, many times at the site of her own blood and others, including during a capillary sample. She would have been permanently deferred as a donor. And has Katie actually stated that in a deposition or something like that? Yes, and her deposition is in the record several times, but including at record 32-2. Thank you. Okay, I would like to begin with duty, because every case must begin with a duty, and whether a duty exists is a matter of law for the court to decide. This case originally included a malpractice claim, which plaintiffs dismissed. Beyond that acknowledgement that no healthcare patient relationship existed here, plaintiff has never articulated the duty that she claims. Wouldn't your client have a duty to use reasonable care under any circumstances, taking it out of the medical context? Just to say, as a general matter, wouldn't there have been a duty to use reasonable care? There's always a duty to act reasonably in light of the apparent risks, Your Honor, and that really goes to the standard of care once a duty is established. But as the District Court noted when it weighed that, the risk here wasn't apparent to BioLife. None of the BioLife employees had ever seen someone have this particular reaction, in which there was a sudden loss consciousness without warning during a finger prick, in all of their experience at BioLife. BioLife submitted the evidence from its expert explaining that it happened rarely, 0.1% of the time, and that was in medical literature regarding venous blood draws, which as Judge Moore noted earlier, are different from a finger prick. A capillary sample is a very short procedure, three to five seconds only, and involves very little volume of blood being removed from the body. Both the duration and the amount of blood removed during a venous blood draw are more substantial, and so you're more likely to see more people have an adverse reaction in that circumstance. So you would expect it to be even more rare in the circumstances at BioLife. BioLife employees described it as, quote, exceedingly rare that an adverse reaction of any kind happens in the screening area. Ms. Pieterzak, the Center Supervisor, noted that in 2018 there were three, only three, out of 100,000 donors who had an adverse reaction in the screening area, and it was in all three instances mild. No one came anywhere close to losing consciousness. Again, the duty that plants seek to assign to BioLife here is a duty to protect her. This is not a situation of active misfeasance. Plants are not alleging that the finger prick was done wrong, that the needle was inserted incorrectly in a way that caused nerve damage. What they're really talking about is non-feasance, where BioLife failed to protect her. The duty to protect a person ordinarily does not arise. There is no duty to aid or protect another absent a special relationship, according to the Michigan Supreme Court in the Williams v. Cunningham drug case. If we view this as a duty to use reasonable care, wouldn't part of that duty be to provide a seat where a person who has an adverse reaction would not be likely to fall on the floor and hit their head and have a concussion and so forth and so on? Again, Your Honor, if you look at Moning v. Solfano, the Michigan Supreme Court case, it talks about the standard of care being exercising reasonable care in light of the apparent. It was extremely rare. There was a seat. There was a seat available to the plaintiff. That's the swivel chair that's high up that she fell from. Yes, but there was nothing dangerous about that chair. It was an ordinary chair. The risk here comes specifically because of plaintiff's unique history of losing consciousness suddenly and without warning when she's exposed to blood or needles. There was a statement by the person who did the finger prick that she was trained to reach the hands and arms of the person who is having this adverse reaction and keep them from falling. Obviously, if she was trained, she had an expectation that this could happen. I don't think it's fair to say that she could have an expectation. I think that she was trained for lots of circumstances that may happen, but a possibility is not a probability, which is what the plaintiffs need here. BioLife's good business practices does not mean the same thing, does not create a legal duty. The test is not the same. Here, there needed to be a special relationship in order for a duty arise for BioLife to protect this person. The risks in this procedure were open and obvious, particularly to this plaintiff, who had superior knowledge that she didn't share with BioLife about her propensity to lose consciousness at the sight of blood or needles. She knew about the risk and BioLife didn't. BioLife, and that brings me to causation, Your Honors, I want to touch on briefly. The law is clear that a failure to warn about a risk that a person already knows about cannot be the proximate cause. Here, plaintiff knew about her unique propensity to lose consciousness, the fact she didn't share with BioLife, and her decision to move forward and attempt plasmapheresis without telling BioLife is really the proximate cause. BioLife's conduct is not. Similarly, plaintiffs have to prove both proximate cause and cause-in-fact to succeed on their claims. Here, they also have no evidence of cause-in-fact. Under Michigan law, cause-in-fact is a but-for test. Here, that amounts to showing that the plaintiff would not have been injured but for the chair or the arrangement in the screening area. There has been no evidence, expert or otherwise, that a different chair or arrangement would have resulted in her not being injured when she lost consciousness without warning. If this is the case about proximate cause, wouldn't your argument be that as a matter of law, her own negligence caused... I mean, that sounds like a contributory negligence argument, so I'm not sure about its viability in a comparative negligence jurisdiction, but wouldn't that be the way that works? But your honor, the failure to tell her couldn't have caused a different result. She already knew the rest and she moved forward with the procedure anyway. But she didn't know she was going to get the finger trick at that particular time, is my understanding from the evidence. Well, I think that plaintiff has misconstrued that a little bit in the record, your honor, and I would direct you to look at her testimony on that point. She got up in the chair. She was aware. She consented to the finger poke. She was aware it was going to occur. She knew what it entailed, and she voluntarily hoisted herself into the chair and extended her arm when Sylvia Roberts, the technician, asked her for it. In conclusion, your honor, plaintiff here had superior knowledge of the risk that led to her injury, failed to disclose it, and now seeks to assign bio life a duty to protect her from a risk it couldn't reasonably anticipate. There's no duty, no breach, and summary judgment should be affirmed. Thank you. Thank you. Mr. Tyler, you have a few minutes. Your mic is muted. Dealing with why it's only good to not tell anybody about her situation, it's frankly because she never reached the point where it would be expected. She was surprised, despite what Ms. Heister said, that the finger poke had happened. She had had her arm examined for a vein check and no one had poked her. Sylvia Roberts admittedly did not tell her she was going to do the finger poke, simply asked to look at her finger, and Tinley Good was surprised when it happened. In her case, she went, oh, no, and then quickly lost consciousness and fell. This is not a failure to warn case. This is a failure to take a proper history and a failure to properly position her, safeguard her. All of the bio life people testified in their depositions that they had to safeguard their donors. In the court's opinion, it talks about the conversation that Tinley had with her mother the night before when she told her that she was going to donate plasma because Tinley, despite this adverse reaction history, did this on a regular basis, not for the $25 that she was going to earn, but because she felt that that was the right thing to do. What she said to her mother when her mother said make sure they know about the adverse history, she said, they'll take care of it just like Michigan blood does. So with respect to being disqualified, there is different testimony in this case whether she would have been qualified or not. She certainly would have been, would have seen a nurse and this would have been discussed, but she could have gone forward with the donation simply by being put into a safe environment, hiding on some kind of lounge chair, et cetera. The trial court found that it was a duty and really decided that there was no evidence that they had, that Tinley had been breached because the probability was so low, even though every vital life person who testified in this case indicated the knowledge of the fact that there can be adverse reactions in this situation. As a result, what happened is the court ignored all of that testimony, ignored Nancy Erickson and Mr. Stanley and decided that the probabilities were so low that we could not prove there had been a breach. The reality is that if Nurse Parks is correct, that Sylvia Roberts was supposed to ask that question before the finger poke, then we have an admitted liability situation where vital life failed to do what they were supposed to do. We would ask that the trial court's opinion, granting summary judgment, be reimbursed and this be remanded back for trial. Appreciate your time. Thank you. Thank you both for your oral argument. The case will be submitted.